SMITH, Circuit Judge.
George Flora and Jay Syverson filed civil actions-seeking damages for fraud, *747 negligent misrepresentation, and breach of contract-against FirePond, Inc. (“Fire-Pond”) and Robertson Stephens, Inc. (“Robertson”). Flora and Syverson appeal [1] the district court’s[2] order dismissing their claims pursuant to Federal Rule of Civil Procedure 12(c). We affirm.
I. Background
A. Flora
Based on the procedural stage of the dismissal, we presume the facts alleged in the complaint to be true. In 1997, Flora orally agreed to supply personnel-placement services to FirePond[3] in exchange for stock options on FirePond securities. Flora agreed to accept stock options on 150,000 shares of FirePond stock in return for his first year of placement services. Per the agreement, Flora’s options were to vest immediately and no limitations were placed on his right to exercise the options.
After performing approximately sixty percent of the placements, in May 1998, FirePond asked Flora to sign a document memorializing the stock-option agreement. Although he disagreed with some of its terms, Flora signed the document. In October of 1998, Flora signed a second stock-option agreement form that contained essentially the same terms as the first agreement. At this point Flora held options on 150,000 shares-with a value of $2.63 per share-of FirePond stock.
In November 1999, FirePond officials informed Flora that FirePond was to become a publically-traded company. Flora was also informed that-as a condition of going forward with the initial public offering (“IPO”)-the underwriter required all existing shareholders and option holders to execute a “lock-up”[4] agreement. Robertson was the primary underwriter for the IPO. On November 11, 1999, Flora executed a lock-up agreement that prevented him from exercising his options for a period of 180 days after February 4, 2000, the date of the IPO. Based on FirePond’s representations, Flora and all other stockholders faced the same conditions.
After skyrocketing to $100 per share, the value of FirePond stock fluctuated dramatically. By the end of the lock-up period the price of FirePond stock had fallen to $17.75 per share-and the stock’s value continued to fall. Flora did not exercise his options at the end of the lock-up period. Instead, he waited until more than one year after the lock-up agreement had expired. By this time the stock’s value was less than $1 per share. Flora later learned, contrary to the representation of FirePond, that not all shareholders and option holders had executed lock-up agreements. He also learned that some shareholders sold stock or exercised options at more favorable prices than the stock’s initial post lock-up value of $17.75 per share.
B. Syverson
Syverson was employed by FirePond and its predecessor Clear With Computers (“CWC”). Syverson received CWC and FirePond stock in exchange for his employment services before the IPO. Like Flora, Syverson was informed that-as a part of the IPO-all shareholders were required to execute lock-up agreements. *748 When Syverson objected to the terms of the lock-up agreement, Christian Misvaer, a staff attorney at FirePond, told him that the agreement was mandatory and that “time was of the essence.” Misvaer also stated that without executed lock-up agreements from every shareholder and option holder, the IPO might not go forward. Misvaer also told Syverson that if he did not sign the lock-up agreement he might have difficulty exchanging his CWC shares for FirePond shares.
Additionally, Syverson received a letter from FirePond’s general counsel, Thomas Carretta, announcing FirePond’s plan to go public. Included with the letter was a copy of the lock-up agreement and a return envelope and airbill. The letter reiterated Roberts.on’s requirement that all shareholders execute the lock-up agreement before the IPO would go forward. Syverson claims that he conditioned his execution of the agreement on Misvaer’s assurance that Syverson would be informed if the lock-up agreements were not required of every shareholder or if they could be modified. Syverson contends that Misvaer agreed to that condition.
Like Flora, Syverson watched the value of his shares rise and then fall dramatically during the 180 day lock-up period. Like Flora’s, the value of Syverson’s shares had dropped to $17.75 per share by the end of the lock-up period and-because Syverson did not sell at the close of the lock-up period-his shares continued to drop in value to less than $2.00 per share. Also, like Flora, Syverson learned that-despite Mis-vaer’s and Carretta’s assurances to the contrary-not all shareholders and option holders had executed lock-up agreements prior to the IPO.
Syverson now asserts that some investors were allowed to sell their FirePond interests immediately after the IPO, when the price was at its highest, while others were subjected to shorter lock-up periods. He brought substantially the same claims against FirePond and Robertson as did Flora.
C. Procedural Summary
Flora filed suit in federal court. His complaint alleged negligent misrepresentation, common-law fraud, breach of contract, violation of the Minnesota Securities Act, the Minnesota Consumer Fraud Act and §§ 10(b) and 17 of the Securities Exchange Act against FirePond. With the exception of breach of contract, Flora alleged the same claims against Robertson. He also claimed that Robertson had violated § 20 of the Securities Exchange Act and tortiously interfered with his contract with FirePond. Essentially, Syverson’s complaint against FirePond and Robertson mirrored Flora’s.
FirePond filed a motion for judgment on the pleadings on January 2, 2002. Robertson did not join in that motion. On March 15 and March 27, 2002, Flora brought motions to amend the complaint. The district court granted FirePond’s motion in part, dismissing Flora’s claims of breach of contract, violation of § 10(b), and violation of § 17. The court denied FirePond’s motion as to Flora’s other claims, pending amendment of the complaint and further briefing by the parties. The court granted Flora’s first motion to amend and denied the second motion to amend.
FirePond renewed its Rule 12(c) motion for judgment on the pleadings as to the remainder of Flora’s claims and brought the same motion as to Syverson’s claims. Robertson moved for dismissal of all claims, pursuant to Fed.R.Civ.P. 12(b)(6). The district court ruled that: (1) there was no negligent misrepresentation; (2) there was no common law fraud; (3) the Minnesota Securities Act was inapplicable; (4) the Minnesota Consumer Fraud Act was *749 not violated; and (5) the statute of limitations barred the securities fraud claim under § 10(b). The court granted judgment for FirePond and Robertson under Rule 12(c). This timely appeal followed.
II. Discussion
“We review a motion for judgment on the pleadings de novo. We accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party.” United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir.2000). Judgment on the pleadings is appropriate where no material issue of fact remains to be résolved and the movant is entitled to judgment as a matter of law. Faibisch v. University of Minnesota, 304 F.3d 797, 803 (8th Cir.2002). We also review de novo the district court’s application of state law. Lefler v. Gen. Cas. Co., 260 F.3d 942, 945 (8th Cir.2001).
A. Negligent Misrepresentation and Fraud
First, Syverson and Flora argue that the district court erred in its dismissal of their negligent misrepresentation claims. The court found that the claims failed as a matter of law. In order to establish a claim for negligent misrepresentation, they were required to allege (and ultimately prove): (1) a duty of reasonable care owed by the defendant in conveying information; (2) a breach of that duty by negligently supplying false information; (3) reasonable reliance on the alleged misrepresentations, which reliance is the proximate cause of plaintiffs injury; and (4) damages. Masepohl v. American Tobacco Co., 974 F.Supp. 1245, 1251 (D.Minn.1997). The district court found that the negligent misrepresentation claims failed because no duty of care existed, no duty of care was alleged, and that neither Flora nor Syverson could prove reasonable reliance. If the district court correctly found either absence of duty or absence of reliance its dismissal will be affirmed.
As noted by the district court, in order to prevail on a claim of negligent misrepresentation, a plaintiff must show that the defendant owed him a legal duty and breached that duty. M.H. v. Caritas Family Svcs., 488 N.W.2d 282, 287 (Minn.1992). In the case of negligent representation, the duty of care arises only when a person supplies information “for the guidance of others in the course of a transaction in which [he] has a pecuniary interest, or in the course of one’s business .... ” Safeco Ins. Co. v. Dain Bosworth, Inc., 531 N.W.2d 867, 871 (Minn.Ct.App.1995). Further, a plaintiff must also demonstrate that he or she reasonably relied on the purported misinformation. Dakota Bank v. Eiesland, 645 N.W.2d 177, 180-181 (Minn.Ct.App.2002) (citing § 552 of the Restatement Second of Torts).
Syverson relies heavily upon Cari-tas to argue that FirePond and Robertson possessed a legal duty to inform him that not all shareholders had to sign the lockup agreement and that the IPO would proceed even without all shareholder signatures. However, assuming arguendo that Syverson and Flora properly alleged a legal duty, their claims nonetheless fail because they cannot show that they reasonably relied on the misinformation that each claims to have received.
Flora’s modified stock-option contract with FirePond was governed by a written agreement negotiated at arm’s length between sophisticated business . persons. Flora argues that he signed the subsequent agreement under duress. But, the facts even as alleged by Flora, do not reflect that the relevant communications *750 overwhelmed Flora’s free will. Syverson’s choice to sign the lock-up agreement was not the product of coercion or the result of a contract of adhesion. Based upon the undisputed facts in this case, such reliance was not reasonable. Neither FirePond nor Robertson sold investment advice. In each case, their expertise lay elsewhere. The facts as alleged reflect a business decision, which hindsight shows imprudent, that was entered into after normal bargaining.
Flora and Syverson each signed the lock-up agreement that contained an express provision allowing the underwriter to “waive any provision of this Lock-Up agreement without notice to any third party.” Thus, even if we were persuaded that Robertson-because of his special relationship with Flora and Syverson-owed a duty of care, the claim still fails. Under these circumstances neither Syverson nor Flora could have reasonably relied on statements made by Robertson that were contrary to the express provisions of the written agreement, which Syverson and Flora each signed. Crowell v. Campbell Soup Co., 264 F.3d 756, 763 (8th Cir.2001). Therefore, we are satisfied that the district court properly dismissed the claims of negligent misrepresentation because they fail as a matter of law. Syverson and Flora’s fraud claims, which also require the same element of reasonable reliance, suffer the same fate.
B. Breach of Contract
Finally, Flora alone argues that FirePond breached the oral contract-to acquire unrestricted stock options in exchange for providing placement services-that he entered into with FirePond in February 1998. Flora later entered into two written “Stock Option Agreements” that contained numerous restrictions as to when Flora could sell the stock upon exercise of his options. Flora was aware of these restrictions-initially objecting to them. In response to Flora’s concerns, FirePond offered to pay Flora the cash value of his services if he was not willing to accept the terms of the “Stock Option Agreements.” He declined the substitute offer and signed the agreements, thereby consenting to the restrictions.
Below, Flora argued that these option agreements, which he signed in May 1998 and November 1998, constituted a breach of the February oral contract because they contained restrictions upon when Flora “could sell the stock following exercise of his options.” The district court found that, although the written agreements Flora signed contained restrictions different from those allegedly communicated orally by FirePond, the “alleged oral contract ... was superseded and replaced by the written stock option agreements willingly signed by Flora.”
Flora’s oral agreement and the written “Stock Option Agreements” covered the same subject matter but with clearly inconsistent terms. The later written agreement controls. Thus, as a matter of law, we find that the May and November written agreements superseded the oral contract. Therefore, the district court properly dismissed Flora’s breach of contract claim.
We note, however, that on appeal Flora argues that the purported oral contract was breached, not by his acquiescence to the written stock-option agreements, but by his acquiescence to the lockup agreement. Flora claims that Fire-Pond had a duty to “deliver unrestricted stock options that would be exercisable at the initial public offering.” This theory, however, was neither alleged nor argued to the district court. And, as a general rule, we do not consider arguments or theories on appeal that were not advanced *751 in the proceedings below. Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000). Accordingly, we will not consider Flora’s revised breach of contract claim-whether Flora’s acquiescence to the lock-up agreement constituted a breach of FirePond’s purported promise to deliver unrestricted stock options.
For the foregoing reasons, the district court’s dismissal is affirmed in all respects.

. Flora and Syverson each appealed the district court's dismissal of their respective actions, and their appeals were consolidated for our review.

. The Honorable David S. Doty, United States District Judge for the District of Minnesota.

. FirePond is a computer software company.

. Lock-up agreements help stabilize stock value during the initial period following a public offering by keeping prior issued shares and options off the market.